1 | **COMP**

2 | **HENNIGAN, BENNETT & DORMAN LLP**
J. Michael Hennigan *(will comply with LR 1A 10-2 within 45 days)*

3 | hennigan@hbdlawyers.com
Bruce Bennett *(will comply with LR 1A 10-2 within 45 days)*

4 | bennettb@hbdlawyers.com
Lauren A. Smith *(will comply with LR 1A 10-2 within 45 days)*

5 | smithl@hbdlawyers.com
Michael C. Schneidereit *(will comply with LR 1A 10-2 within 45 days)*

6 | schneidereitm@hbdlawyers.com
865 South Figueroa Street, Suite 2900

7 | Los Angeles, California 90017
Telephone: (213) 694-1200

8 | Fax: (213) 694-1234

9 |

10 | Attorneys for Plaintiffs

11 | 

12 | **UNITED STATES DISTRICT COURT**

13 | **DISTRICT OF NEVADA**

14 |

15 | AVENUE CLO FUND, LTD.; AVENUE )   Case No. _____
CLO II, LTD.; AVENUE CLO III, LTD.; )

16 | AVENUE CLO IV, LTD.; AVENUE CLO V, )   **COMPLAINT FOR BREACH OF**
LTD.; AVENUE CLO VI, LTD.; BABSON )   **CONTRACT, BREACH OF THE IMPLIED**

17 | CLO LTD. 2004-I; BABSON CLO LTD. )   **COVENANT OF GOOD FAITH AND FAIR**
2004-II; BABSON CLO LTD. 2005-I; )   **DEALING, AND DECLARATORY RELIEF**

18 | BABSON CLO LTD. 2005-II; BABSON )
CLO LTD. 2005-III; BABSON CLO LTD. )   **JURY TRIAL DEMANDED**

19 | 2006-I; BABSON CLO LTD. 2006-II; )
BABSON CLO LTD. 2007-I; ARTUS LOAN )

20 | FUND 2007-I LTD.; BABSON LOAN )
OPPORTUNITY CLO, LTD.; JFIN CLO )

21 | 2007 LTD.; SAPPHIRE VALLEY CDO I, )
LTD.; JEFFERIES FINANCE CP FUNDING )

22 | LLC; BRIGADE LEVERAGED CAPITAL )
STRUCTURES FUND, LTD.; BATTALION )

23 | CLO 2007-1 LTD.; CANYON CAPITAL )
ADVISORS, LLC; CASPIAN CORPORATE )

24 | LOAN FUND, LLC; CASPIAN CAPITAL )
PARTNERS, L.P.; CASPIAN SELECT )

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

| | |
|---|---|
| 1 | CREDIT MASTER FUND, LTD.; ) |
| | MARINER OPPORTUNITIES FUND, LP; ) |
| 2 | SANDS POINT FUNDING LTD.; COPPER ) |
| | RIVER CLO LTD.; KENNECOTT ) |
| 3 | FUNDING LTD.; NZC OPPORTUNITIES ) |
| | (FUNDING) II LIMITED; GREEN LANE ) |
| 4 | CLO LTD.; 1888 FUND, LTD.; ORPHEUS ) |
| | FUNDING LLC; ORPHEUS HOLDINGS ) |
| 5 | LLC; LFC2 LOAN FUNDING LLC; ) |
| | HALCYON LOAN INVESTORS CLO I ) |
| 6 | LTD.; HALCYON LOAN INVESTORS CLO ) |
| | II LTD.; HALCYON STRUCTURED ASSET ) |
| 7 | MANAGEMENT LONG SECURED/SHORT ) |
| | UNSECURED CLO 2006-1 LTD.; ) |
| 8 | HALCYON STRUCTURED ASSET ) |
| | MANAGEMENT EUROPEAN CLO 2008-II ) |
| 9 | B.V.; HALCYON STRUCTURED ASSET ) |
| | MANAGEMENT CLO I LTD.; HALCYON ) |
| 10 | STRUCTURED ASSET MANAGEMENT ) |
| | LONG SECURED/SHORT UNSECURED ) |
| 11 | 2007-1 LTD.; HALCYON STRUCTURED ) |
| | ASSET MANAGEMENT LONG ) |
| 12 | SECURED/SHORT UNSECURED 2007-2 ) |
| | LTD.; HALCYON STRUCTURED ASSET ) |
| 13 | MANAGEMENT LONG SECURED/SHORT ) |
| | UNSECURED 2007-3 LTD.; ABERDEEN ) |
| 14 | LOAN FUNDING, LTD.; ARMSTRONG ) |
| | LOAN FUNDING, LTD.; BRENTWOOD ) |
| 15 | CLO, LTD.; EASTLAND CLO, LTD.; ) |
| | EMERALD ORCHARD LIMITED; ) |
| 16 | GLENEAGLES CLO, LTD.; GRAYSON ) |
| | CLO, LTD.; GREENBRIAR CLO, LTD.; ) |
| 17 | HIGHLAND CREDIT OPPORTUNITIES ) |
| | CDO, LTD.; HIGHLAND LOAN FUNDING ) |
| 18 | V, LTD.; HIGHLAND OFFSHORE ) |
| | PARTNERS, L.P.; JASPER CLO, LTD.; ) |
| 19 | LIBERTY CLO, LTD.; LOAN FUNDING IV ) |
| | LLC; LOAN FUNDING VII LLC; LOAN ) |
| 20 | STAR STATE TRUST; LONGHORN ) |
| | CREDIT FUNDING, LLC; RED RIVER ) |
| 21 | CLO, LTD.; ROCKWALL CDO LTD.; ) |
| | ROCKWALL CDO II, LTD.; SOUTHFORK ) |
| 22 | CLO, LTD.; STRATFORD CLO, LTD.; ) |
| | WESTCHESTER CLO, LTD.; ING PRIME ) |
| 23 | RATE TRUST; ING SENIOR INCOME ) |
| | FUND; ING INTERNATIONAL (II) - ) |
| 24 | SENIOR BANK LOANS EURO; ING ) |

741299

1  INTERNATIONAL (II) - SENIOR BANK
   LOANS USD; ING INVESTMENT
2  MANAGEMENT CLO I, LTD.; ING
   INVESTMENT MANAGEMENT CLO II,
3  LTD.; ING INVESTMENT MANAGEMENT
   CLO III, LTD.; ING INVESTMENT
4  MANAGEMENT CLO IV, LTD.; ING
   INVESTMENT MANAGEMENT CLO V,
5  LTD.; ENCORE FUND LP; NUVEEN
   FLOATING RATE INCOME FUND;
6  FORTISSIMO FUND; NUVEEN
   FLOATING RATE INCOME
7  OPPORTUNITY FUND; NUVEEN SENIOR
   INCOME FUND; SYMPHONY CREDIT
8  OPPORTUNITY FUND, LTD.;
   SYMPHONY CLO I, LTD.; SYMPHONY
9  CLO II, LTD.; SYMPHONY CLO III, LTD.;
   SYMPHONY CLO IV, LTD.; SYMPHONY
10 CLO V, LTD.; CARLYLE HIGH YIELD
   PARTNERS 2008-1, LTD.; CARLYLE
11 HIGH YIELD PARTNERS V, LTD.;
   CARLYLE HIGH YIELD PARTNERS VI,
12 LTD.; CARLYLE HIGH YIELD PARTNERS
   VII, LTD.; CARLYLE HIGH YIELD
13 PARTNERS VIII, LTD.; CARLYLE HIGH
   YIELD PARTNERS IX, LTD.; CARLYLE
14 LOAN INVESTMENT, LTD.; CENTURION
   CDO VI, LTD.; CENTURION CDO VII,
15 LTD.; CENTURION CDO 8, LIMITED;
   CENTURION CDO 9, LIMITED; CENT
16 CDO 10 LIMITED; CENT CDO XI
   LIMITED; CENT CDO 12 LIMITED; CENT
17 CDO 14 LIMITED; CENT CDO 15
   LIMITED; VENTURE II CDO 2002,
18 LIMITED; VENTURE III CDO LIMITED;
   VENTURE IV CDO LIMITED; VENTURE
19 V CDO LIMITED; VENTURE VI CDO
   LIMITED; VENTURE VII CDO LIMITED;
20 VENTURE VIII CDO LIMITED; VENTURE
   IX CDO LIMITED; VISTA LEVERAGED
21 INCOME FUND; VEER CASH FLOW CLO,
   LIMITED; DUANE STREET CLO 1, LTD.;
22 DUANE STREET CLO II, LTD.; DUANE
   STREET CLO III, LTD.; DUANE STREET
23 CLO IV, LTD.; DUANE STREET CLO V,
   LTD.; JAY STREET MARKET VALUE
24 CLO I, LTD.; RIVA RIDGE MASTER

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-3-

741299

1 | FUND, LTD.; MARINER LDC; and )
GENESIS CLO 2007-1 LTD., )
2 | )
          Plaintiffs, )
3 | )
vs. )
4 | )
BANK OF AMERICA, N.A.; MERRILL )
5 | LYNCH CAPITAL CORPORATION; )
JPMORGAN CHASE BANK, N.A.; )
6 | BARCLAYS BANK PLC; DEUTSCHE )
BANK TRUST COMPANY AMERICAS; )
7 | THE ROYAL BANK OF SCOTLAND PLC; )
SUMITOMO MITSUI BANKING )
8 | CORPORATION; BANK OF SCOTLAND; )
HSH NORDBANK AG; MB FINANCIAL )
9 | BANK, N.A.; and CAMULOS MASTER )
FUND, L.P., )
10 | )
          Defendants. )
11 | )

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-4-

741299

This action is brought by the Plaintiffs, each of which are lenders under a June 2007 Credit Agreement (the "Credit Agreement"), by and among, *inter alia*, Fontainebleau Las Vegas, LLC and Fontainebleau Las Vegas II, LLC (the "Borrowers"), the lenders referred to therein, and Bank of America N.A, in many capacities (in all capacities, "BofA") intended to provide funds for the construction of the Fontainebleau Resort and Casino (the "Project") in Las Vegas, Nevada, against Bank of America, N.A., Merrill Lynch Capital Corporation, J.P. Morgan Chase Bank, N.A., Barclays Bank PLC, Deutsche Bank Trust Company Americas, The Royal Bank of Scotland PLC, Sumitomo Mitsui Banking Corporation, Bank of Scotland, HSH Nordbank AG, MB Financial Bank, N.A., and Camulos Master Fund, L.P. ("Defendants"), each of which are also lenders under the Credit Agreement, for Defendants' failure and refusal to fund their contractual loan commitments under the Credit Agreement, and for BofA's breach of its obligations under a related Disbursement Agreement.  Plaintiffs allege for their complaint as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this action pursuant to 12 U.S.C. § 632 because defendants BofA, JPMorgan Chase Bank, N.A. and MB Financial Bank, N.A. are national banking associations organized under the laws of the United States and the action arises out of transactions involving international or foreign banking or other international or foreign financial operations, within the meaning of 12 U.S.C. § 632.

2.      Venue in the United States District Court for the District of Nevada is proper because the Project is located in this District and many of the acts and transactions at issue occurred in this District.

## INTRODUCTORY ALLEGATIONS

3.      In March 2007, Plaintiffs were approached by a syndicate of investment bankers, including affiliates of the Defendants, to participate in a $1.85 billion bank financing for the

1  development and construction of the Project. The total project costs were to be funded primarily

2  from cash provided by the developers of the Project, the proceeds of the $1.85 billion bank

3  financing, and the proceeds of a $675 million 2nd Mortgage Note offering.

4      4.      In June 2007, the Credit Agreement was entered into among numerous lenders,

5  including Plaintiffs and Defendants, and the Borrowers. The Credit Agreement included

6  commitments for three kinds of loans: (a) a $700 million initial term loan facility (the "Term Loan

7  Facility"); (b) a $350 million delay draw term facility (the "Delay Draw Facility"); and (c) an

8  $800 million revolving loan facility (the "Revolver Facility"). The Term Loan Facility was funded

9  upon the closing of the Credit Agreement in June 2007. The Delay Draw Facility and Revolver

10  Facility were to be used to fund future construction costs of the Project.

11      5.      Plaintiffs are each lenders under the Term Loan Facility and under the Delay Draw

12  Facility. Defendants are each lenders under the Revolver Facility. The lenders' funding

13  commitments under each of the facilities were integral to the construction and development of the

14  Project, and to Plaintiffs' decision to make their loan commitments. Each of the lenders agreed that

15  their loan commitments were several and not joint, and that the failure of any lender to fund its loan

16  commitments did not relieve any other lender of its obligation to fund its loan commitments, nor

17  was any lender required to fund another defaulting lender's loan commitments. Moreover, each of

18  the lenders agreed that its obligation to fund loans was not conditioned on the absence of any Events

19  of Default (as that term is defined in the Credit Agreement) at the time of the borrowing request.

20  Rather, the Delay Draw Facility lenders and the Revolver Facility lenders could refuse to fund their

21  obligations only if their commitments were validly terminated in accordance with the specific terms

22  of the Credit Agreement.

23      6.      Obligations outstanding under the Term Loan Facility, the Delay Draw Facility and

24  the Revolver Facility are equally and ratably collateralized by mortgages on the real property

-2-

741299

1    comprising the Project and by security interests on all personal property of the Borrowers. The

2    personal property security interests as well as statutory and/or common law rights of setoff also

3    extend to deposit accounts, including the Bank Proceeds Account (defined below) and the Bank

4    Funding Account established pursuant to the terms of the Master Disbursement Agreement (the

5    "Disbursement Agreement").

6        7.    Under the Credit Agreement and other Loan Documents, BofA acted in several

7    capacities, including as a Revolver Facility lender, as Issuing Lender, and as Swing Line Lender. In

8    addition, BofA served as Administrative Agent to all of the Lenders under the Credit Agreement and

9    as Disbursement Agent to all of the Lenders under the Disbursement Agreement. As a consequence

10   of those latter roles, BofA had access to information unavailable to other lenders.

11       8.    On March 2, 2009, the Borrowers issued a notice of borrowing to borrow the entire

12   amount available under the Delay Draw Facility and to borrow the remaining amount available

13   under the Revolver Facility (the "March 2 Notice"). The next day, the Borrowers issued another

14   notice of borrowing to correct a scrivener's error made in calculating the amount sought under the

15   Revolver Facility (the "March 3 Notice"). Both notices caused the Delay Draw Facility to be fully

16   drawn. At the time of these notices of borrowing, the Plaintiffs were unaware of the existence of

17   any Event of Default and no lender's obligation to fund loans under the Credit Agreement had been

18   terminated.

19       9.    BofA submitted the March 2 Notice and the March 3 Notice to the lenders, but

20   determined that the notices did not comply with the terms of the Credit Agreement and advised the

21   lenders that an ad hoc steering committee formed by BofA supported the position that the March 3

22   Notice did not comply with the terms of the Credit Agreement. BofA's communications to the

23   Plaintiffs regarding the invalidity of the March 2 Notice and the March 3 Notice did not provide any

24   information in BofA's possession that would have put Plaintiffs on notice of the existence of an

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

741299

1  Event of Default under the Credit Agreement.

2      10.    BofA also informed the Borrowers that it would not be processing the March 2

3  Notice because it did not comply with the terms of the Credit Agreement.  In its correspondence to

4  the Borrowers, BofA took the position that the March 2 Notice and the March 3 Notice did not

5  comply with the Credit Agreement because they contained simultaneous requests for borrowing

6  under both the Delay Draw Facility and the Revolver Facility.  A simultaneous request for loans

7  under the two facilities, however, is not prohibited under and is consistent with the Credit

8  Agreement.

9      11.    The pretext for BofA's position is a provision in the Credit Agreement, Section

10  2.1(c)(iii), which BofA interpreted to mean that the outstanding balance of the Revolver Facility

11  loans under the Credit Agreement are limited to $150 million unless the Delay Draw Facility is fully

12  funded.  This position, however, is contrary to the plain language of the Credit Agreement which

13  provides that the outstanding balance of the Revolver Facility loans and Swing Line loans can

14  exceed $150 million once the "Total Delay Draw Commitments have been fully *drawn*."  (emphasis

15  added)

16      12.    BofA's refusal to honor the March 2 Notice and the March 3 Notice can only be valid

17  if "fully drawn" actually means that the Delay Draw Facility must be "fully funded" in advance of

18  issuing a notice of borrowing for the Revolver Facility loan, and that until the Delay Draw Facility

19  is fully funded, no Revolver Facility lender is required to meet its obligation to make loans to the

20  Borrowers.  Such position is not only inconsistent with the language of the Credit Agreement quoted

21  above, it is also inconsistent with other provisions of the Credit Agreement that specifically impose

22  a legal obligation on each lender to fund loans, even if other lenders fail to meet their obligations to

23  do so.  Under BofA's flawed interpretation, the Revolver Facility lenders could refuse to fund if the

24  Borrowers requested a full draw down of the Delay Draw Facility, but one of the Delay Draw

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1  Facility lenders failed to fund.  This is not what the lenders agreed to under the Credit Agreement

2  since the Credit Agreement specifies that no lender's obligation to fund loans is contingent on

3  another lender fulfilling its loan commitments.

4        13.    Immediately after the Revolver Facility lenders failed and refused to fund loans in

5  response to the March 2 Notice and the March 3 Notice, BofA sought to schedule a meeting with

6  representatives of the Project and other lenders, including Defendants, to discuss "construction

7  concerns."  On information and belief, BofA's concerns were based upon information it obtained

8  regarding the Project and the Borrowers, including the Borrowers' ability to complete the project

9  using available funds, the Borrowers' ability to repay outstanding amounts under the Revolver

10  Facility and any other amounts to be advanced by the Revolver Facility lenders to Borrowers, and/or

11  that one or more Events of Default might have occurred before the March 3 Notice.  BofA thereafter

12  undertook to avoid its obligations under the Credit Agreement, and preferred the interests of the

13  Revolver Facility lenders, including itself, over the Delay Draw Facility lenders by failing to provide

14  information in its possession to Plaintiffs concerning the status and financial condition of the

15  Project, the potential existence of Events of Default under the Credit Agreement, and BofA's

16  position regarding funding draws on the Revolver Facility.

17        14.    On March 9, 2009, the Borrowers, noting that they continued to believe that the

18  March 2 Notice and the March 3 Notice were valid and that BofA "may be acting in its own self-

19  interest by failing to process the notices," issued a revised borrowing notice directed solely to the

20  Delay Draw Facility lenders.  BofA processed this notice and sent it to all Delay Draw Facility

21  lenders.  On information and belief, BofA failed to provide Plaintiffs information in BofA's

22  possession regarding the Borrowers, the Project, the potential existence of Events of Defaults under

23  the Credit Agreement, and BofA's position regarding future fundings under the Revolver Facility.

24  Unaware of the existence of Events of Default, if any, on or about March 10, 2009 and thereafter,

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

741299

1   Plaintiffs complied with their Delay Draw Facility commitments and honored their obligations to

2   fund the Delay Draw Facility.  Pursuant to the terms of the Credit Agreement, a portion of these

3   funds was immediately used to repay the outstanding balance under the Revolver Facility, including

4   loans made by BofA, thus benefiting the Defendants, to the detriment of the Plaintiffs.

5       15.     The balance of the funds received under the Delay Draw Facility was placed into the

6   Bank Proceeds Account (as defined below).  These funds could only be transferred out of the Bank

7   Proceeds Account to the Bank Funding Account and then to pay construction costs pursuant to an

8   Advance Request that was approved by BofA as Disbursement Agent in accordance with the

9   provisions contained in the Disbursement Agreement.  BofA could only approve the Advance

10  Request if various representations and warranties were made, including, but not limited to, that, as

11  of the Advance Date, there was no Default or Event of Default under any of the Financing

12  Agreements, the In Balance Test was satisfied, that there had been no development or event since

13  the Closing Date that could reasonably be expected to have a Material Adverse Effect on the Project,

14  and the Borrowers and their subsidiaries were solvent on a consolidated basis.

15      16.     The Delay Draw Facility lenders are intended third party beneficiaries of the

16  Disbursement Agreement. The Disbursement Agreement expressly provides that BofA holds for the

17  benefit of the Delay Draw Facility lenders the security interests granted by and the restrictions on

18  disbursal of funds from the Bank Proceeds Account and the Bank Funding Account contained in the

19  transaction documents, including but not limited to Section 2.3 of the Disbursement Agreement.

20  Additionally, Section 9.10 of the Disbursement Agreement expressly provides that BofA is

21  responsible and liable to the Delay Draw Facility lenders as a consequence of its performance under

22  the Disbursement Agreement for acts of bad faith, fraud, gross negligence or willful misconduct.

23      17.     As of March 25, 2009, the Advance Date requested by the Borrowers, either BofA

24  was aware of defaults or misrepresentations by the Borrowers, or the Revolver Facility lenders'

741299

1  failure to fund the Revolver Facility pursuant to the March 2 Notice or the March 3 Notice was a

2  default under the Financing Agreements.  Either way, BofA should not have approved the Advance

3  Request.  Instead, BofA approved the request and caused approximately $133 million of the Delay

4  Draw Facility funds to be transferred out of the Bank Proceeds Account.  Once again, by approving

5  this request for funds, and in violation of its obligations as Disbursement Agent, BofA favored its

6  position to the detriment of the Delay Draw Facility lenders.

7       18.     Shortly after Plaintiffs' funding of the Delay Draw Facility and the release of

8  approximately $133 million of Delay Draw Facility funds from the Bank Proceeds Account, on

9  April 20, 2009, Defendants purported to terminate their Revolver Facility loan commitments based

10  on one or more unspecified Events of Default.  While Events of Default may have existed before

11  March 3, 2009, Plaintiffs are unaware of any Event of Default which first occurred between March

12  3, 2009 and April 20, 2009 under the Credit Agreement; however, even if such Events of Default

13  existed on April 20, 2009, Defendants could not retroactively terminate their existing obligations to

14  fund in response to the March 2 Notice and the March 3 Notice, when there were no claimed Events

15  of Default and the Revolver Facility had not been terminated.  Either there existed an Event of

16  Default on March 3, which, had it been known by Plaintiffs, would have allowed all lenders to

17  terminate their unfunded commitments, or there was no such event, leaving all lenders equally

18  obligated to fund pursuant to the March 2 Notice and the March 3 Notice.

19       19.     Plainly, the world's economic circumstances have negatively impacted the Project.

20  These economic circumstances, however, do not justify Defendants' refusal to fund their loan

21  commitments and their wrongful termination of the Credit Agreement at this critical juncture.  As a

22  consequence of Defendants' wrongful refusal to fund and their termination of the Revolver Facility

23  commitments, the Project has been derailed.  More importantly, for purposes of this Action,

24  Defendants' failure to perform their contractual obligations reduced the amount and value of the

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

741299

collateral securing Plaintiffs' loans contrary to Plaintiffs' bargained for rights and benefits under the Credit Agreement and Disbursement Agreement.

## PARTIES

**Plaintiffs**

20.    Plaintiff Avenue CLO Fund, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

21.    Plaintiff Avenue CLO II, Ltd. is a company incorporated with limited liability under the laws of the Cayman Islands.

22.    Plaintiff Avenue CLO III, Ltd. is a company incorporated with limited liability under the laws of the Cayman Islands.

23.    Plaintiff Avenue CLO IV, Ltd. is a company incorporated with limited liability under the laws of the Cayman Islands.

24.    Plaintiff Avenue CLO V, Ltd. is a company incorporated with limited liability under the laws of the Cayman Islands.

25.    Plaintiff Avenue CLO VI, Ltd. is a company incorporated with limited liability under the laws of the Cayman Islands.

26.    Plaintiff Babson CLO Ltd. 2004-I is a company incorporated with limited liability under the laws of the Cayman Islands.

27.    Plaintiff Babson CLO Ltd. 2004-II is a company incorporated with limited liability under the laws of the Cayman Islands.

28.    Plaintiff Babson CLO Ltd. 2005-I is a company incorporated with limited liability under the laws of the Cayman Islands.

29.    Plaintiff Babson CLO Ltd. 2005-II is a company incorporated with limited liability under the laws of the Cayman Islands.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

741299

30.     Plaintiff Babson CLO Ltd. 2005-III is a company incorporated with limited liability under the laws of the Cayman Islands.

31.     Plaintiff Babson CLO Ltd. 2006-I is a company incorporated with limited liability under the laws of the Cayman Islands.

32.     Plaintiff Babson CLO Ltd. 2006-II is a company incorporated with limited liability under the laws of the Cayman Islands.

33.     Plaintiff Babson CLO Ltd. 2007-I is a company incorporated with limited liability under the laws of the Cayman Islands.

34.     Plaintiff Artus Loan Fund 2007-I Ltd. is a company incorporated with limited liability under the laws of the Cayman Islands.

35.     Plaintiff Babson Loan Opportunity CLO, Ltd. is a company incorporated with limited liability under the laws of the Cayman Islands.

36.     Plaintiff JFIN CLO 2007 Ltd. is a company incorporated with limited liability under the laws of the Cayman Islands.

37.     Plaintiff Sapphire Valley CDO I, Ltd. is a company incorporated with limited liability under the laws of the Cayman Islands.

38.     Plaintiff Jefferies Finance CP Funding LLC is a limited liability company formed under the laws of Delaware with its principal place of business in New York, NY;

39.     Plaintiff Brigade Leveraged Capital Structures Fund, Ltd. is an exempted company incorporated with limited liability under the laws of the Cayman Islands.

40.     Plaintiff Battalion CLO 2007-1 Ltd. is an exempted company incorporated with limited liability under the laws of the Cayman Islands.

41.     Plaintiff Canyon Capital Advisors LLC is a limited liability company formed under the laws of the State of Delaware. Canyon Capital Advisors LLC is the investment advisor of funds

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

741299

1   that are the holders of Term Loans.

2        42.    Plaintiff Caspian Corporate Loan Fund, LLC is a limited liability company formed

3   under the laws of Delaware.

4        43.    Plaintiff Caspian Capital Partners, L.P. is a limited partnership formed under the laws

5   of Delaware.

6        44.    Plaintiff Caspian Select Credit Master Fund, Ltd. is a limited liability company

7   formed under the laws of the Cayman Islands.

8        45.    Plaintiff Mariner Opportunities Fund, LP is a limited partnership formed under the

9   laws of Delaware.

10       46.    Plaintiff Sands Point Funding Ltd. is a company with limited liability incorporated

11   under the laws of the Cayman Islands.

12       47.    Plaintiff Copper River CLO Ltd. is a company with limited liability incorporated

13   under the laws of the Cayman Islands.

14       48.    Plaintiff Kennecott Funding Ltd. is a company with limited liability incorporated

15   under the laws of the Cayman Islands.

16       49.    Plaintiff NZC Opportunities (Funding) II Limited is a company with limited liability

17   incorporated under the laws of the Cayman Islands.

18       50.    Plaintiff Green Lane CLO Ltd. is a company with limited liability incorporated under

19   the laws of the Cayman Islands.

20       51.    Plaintiff 1888 Fund, Ltd. is a company with limited liability incorporated under the

21   laws of the Cayman Islands.

22       52.    Plaintiff Orpheus Funding LLC is a Delaware limited liability company.

23       53.    Plaintiff Orpheus Holdings LLC is a Delaware limited liability company.

24       54.    Plaintiff LFC2 Loan Funding LLC is a Delaware limited liability company.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

741299

55.    Plaintiff Halcyon Loan Investors CLO I Ltd. is an exempted company with limited liability incorporated under the laws of the Cayman Islands.

56.    Plaintiff Halcyon Loan Investors CLO II Ltd. is an exempted company incorporated with limited liability under the laws of the Cayman Islands.

57.    Plaintiff Halcyon Structured Asset Management Long Secured/Short Unsecured CLO 2006-1 Ltd. is an exempted company with limited liability incorporated under the laws of the Cayman Islands.

58.    Plaintiff Halcyon Structured Asset Management European CLO 2008-II B.V. is a company with limited liability incorporated under the laws of The Netherlands.

59.    Plaintiff Halcyon Structured Asset Management CLO I Ltd. is an exempted company with limited liability incorporated under the laws of the Cayman Islands.

60.    Plaintiff Halcyon Structured Asset Management Long Secured/Short Unsecured 2007-1 Ltd. is an exempted company with limited liability incorporated under the laws of the Cayman Islands.

61.    Plaintiff Halcyon Structured Asset Management Long Secured/Short Unsecured 2007-2 Ltd. is an exempted company with limited liability incorporated under the laws of the Cayman Islands.

62.    Plaintiff Halcyon Structured Asset Management Long Secured/Short Unsecured 2007-3 Ltd. is an exempted company with limited liability incorporated under the laws of the Cayman Islands.

63.    Plaintiff Aberdeen Loan Funding, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

64.    Plaintiff Armstrong Loan Funding, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-11-

741299

65.     Plaintiff Brentwood CLO, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

66.     Plaintiff Eastland CLO, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

67.     Plaintiff Emerald Orchard Limited is a company with limited liability incorporated under the laws of the Cayman Islands.

68.     Plaintiff Gleneagles CLO, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

69.     Plaintiff Grayson CLO, Ltd. is a company incorporated under the laws of the Cayman Islands.

70.     Plaintiff Greenbriar CLO, Ltd. is a company incorporated under the laws of the Cayman Islands.

71.     Plaintiff Highland Credit Opportunities CDO, Ltd. is a company incorporated under the laws of the Cayman Islands.

72.     Plaintiff Highland Loan Funding V, Ltd. is a company incorporated under the laws of the Cayman Islands.

73.     Plaintiff Highland Offshore Partners, L.P. is limited partnership formed under the laws of Bermuda.

74.     Plaintiff Jasper CLO, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

75.     Plaintiff Liberty CLO, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

76.     Plaintiff Loan Funding IV LLC is a is a Delaware limited liability company.

77.     Plaintiff Loan Funding VII LLC is a Delaware limited liability company.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

741299

78. Plaintiff Loan Star State Trust is a trust formed under the laws of the Cayman Islands.

79. Plaintiff Longhorn Credit Funding, LLC is a limited liability company formed under the laws of the State of Delaware.

80. Plaintiff Red River CLO, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

81. Plaintiff Rockwall CDO, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

82. Plaintiff Rockwall CDO II, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

83. Plaintiff Southfork CLO, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

84. Plaintiff Stratford CLO, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

85. Plaintiff Westchester CLO, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

86. Plaintiff ING Prime Rate Trust is a business trust formed under the laws of Massachusetts.

87. Plaintiff ING Senior Income Fund is a statutory trust formed under the laws of Delaware.

88. Plaintiff ING International (II) - Senior Bank Loans Euro is a SICAV (Société d'Investissement à Capital Variable) formed under the laws of Luxembourg.

89. Plaintiff ING International (II) - Senior Bank Loans USD is a SICAV (Société d'Investissement à Capital Variable) formed under the laws of Luxembourg.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-13-

90.    Plaintiff ING Investment Management CLO I, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

91.    Plaintiff ING Investment Management CLO II, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

92.    Plaintiff ING Investment Management CLO III, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

93.    Plaintiff ING Investment Management CLO IV, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

94.    Plaintiff ING Investment Management CLO V, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

95.    Plaintiff Encore Fund LP is a limited partnership formed under the laws of the Cayman Islands.

96.    Plaintiff Nuveen Floating Rate Income Fund is organized as a Massachusetts business trust.

97.    Plaintiff Fortissimo Fund is a limited partnership formed under the laws of the Cayman Islands.

98.    Plaintiff Nuveen Floating Rate Income Opportunity Fund is organized as a Massachusetts business trust.

99.    Plaintiff Nuveen Senior Income Fund is organized as a Massachusetts business trust.

100.    Plaintiff Symphony Credit Opportunity Fund, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

101.    Plaintiff Symphony CLO I, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

102.    Plaintiff Symphony CLO II, Ltd. is a company with limited liability incorporated

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-14-

741299

1  under the laws of the Cayman Islands.

2        103.   Plaintiff Symphony CLO III, Ltd. is a company with limited liability incorporated

3  under the laws of the Cayman Islands.

4        104.   Plaintiff Symphony CLO IV, Ltd. is a company with limited liability incorporated

5  under the laws of the Cayman Islands.

6        105.   Plaintiff Symphony CLO V, Ltd. is a company with limited liability incorporated

7  under the laws of the Cayman Islands.

8        106.   Plaintiff Carlyle High Yield Partners 2008-1, Ltd. is an exempted company with

9  limited liability incorporated under the laws of the Cayman Islands.

10       107.   Plaintiff Carlyle High Yield Partners V, Ltd. is an exempted company with limited

11  liability incorporated under the laws of the Cayman Islands.

12       108.   Plaintiff Carlyle High Yield Partners VI, Ltd. is an exempted company with limited

13  liability incorporated under the laws of the Cayman Islands.

14       109.   Plaintiff Carlyle High Yield Partners VII, Ltd. is an exempted company with limited

15  liability incorporated under the laws of the Cayman Islands.

16       110.   Plaintiff Carlyle High Yield Partners VIII, Ltd. is an exempted company with limited

17  liability incorporated under the laws of the Cayman Islands.

18       111.   Plaintiff Carlyle High Yield Partners IX, Ltd. is an exempted company with limited

19  liability incorporated under the laws of the Cayman Islands.

20       112.   Plaintiff Carlyle Loan Investment, Ltd. is an exempted company with limited liability

21  incorporated under the laws of the Cayman Islands.

22       113.   Plaintiff Centurion CDO VI, Ltd. is a company with limited liability incorporated

23  under the laws of the Cayman Islands.

24

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

741299

114. Plaintiff Centurion CDO VII, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

115. Plaintiff Centurion CDO 8, Limited is a company with limited liability incorporated under the laws of the Cayman Islands.

116. Plaintiff Centurion CDO 9, Limited is a company with limited liability incorporated under the laws of the Cayman Islands.

117. Plaintiff Cent CDO 10 Limited is a company with limited liability incorporated under the laws of the Cayman Islands.

118. Plaintiff Cent CDO XI Limited is a company with limited liability incorporated under the laws of the Cayman Islands.

119. Plaintiff Cent CDO 12 Limited is a company with limited liability incorporated under the laws of the Cayman Islands.

120. Plaintiff Cent CDO 14 Limited is a company with limited liability incorporated under the laws of the Cayman Islands.

121. Plaintiff Cent CDO 15 Limited is a company with limited liability incorporated under the laws of the Cayman Islands.

122. Plaintiff Venture II CDO 2002, Limited is a company with limited liability incorporated under the laws of the Cayman Islands.

123. Plaintiff Venture III CDO is a company with limited liability incorporated under the laws of the Cayman Islands.

124. Plaintiff Venture IV CDO Limited is a company with limited liability incorporated under the laws of the Cayman Islands.

125. Plaintiff Venture V CDO Limited is a company with limited liability incorporated under the laws of the Cayman Islands.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

126.    Plaintiff Venture VI CDO Limited is a company with limited liability incorporated under the laws of the Cayman Islands.

127.    Plaintiff Venture VII CDO Limited is a company with limited liability incorporated under the laws of the Cayman Islands.

128.    Plaintiff Venture VIII CDO Limited is a company with limited liability incorporated under the laws of the Cayman Islands.

129.    Plaintiff Venture IX CDO Limited is a company with limited liability incorporated under the laws of the Cayman Islands.

130.    Plaintiff Vista Leveraged Income Fund is a company with limited liability incorporated under the laws the Cayman Islands.

131.    Plaintiff Veer Cash Flow, CLO, Limited is a company with limited liability incorporated under the laws of the Cayman Islands.

132.    Plaintiff Duane Street CLO 1, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

133.    Plaintiff Duane Street CLO II, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

134.    Plaintiff Duane Street CLO III, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

135.    Plaintiff Duane Street CLO IV, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

136.    Plaintiff Duane Street CLO V, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

137.    Plaintiff Jay Street Market Value CLO I, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

741299

138.    Plaintiff Riva Ridge Master Fund, Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

139.    Plaintiff Mariner LDC is a Cayman Islands limited duration company.

140.    Plaintiff Genesis CLO 2007-1 Ltd. is a company with limited liability incorporated under the laws of the Cayman Islands.

**Defendants**

141.    Defendant BofA is a nationally chartered bank with its main office in Charlotte, North Carolina.  Under the Credit Agreement and other Loan Documents, BofA acted in several capacities, including as a Revolver Facility lender, as Issuing Lender, and as Swing Line Lender.  In addition, BofA served as Administrative Agent to all of the Lenders under the Credit Agreement and as Disbursement Agent to all of the Lenders under the Disbursement Agreement.  BofA agreed to fund $100 million under the Revolving Loan.

142.    Defendant Merrill Lynch Capital Corporation is a Delaware corporation with a principal place of business in New York.  Merrill Lynch Capital Corporation, which is now indirectly owned by BofA, agreed to fund $100 million under the Revolver facility.

143.    Defendant J.P. Morgan Chase Bank, N.A. is a nationally chartered bank with its headquarters in New York, New York.  J.P. Morgan Chase Bank, N.A. agreed to fund $90 million under the Revolver facility.

144.    Defendant Barclays Bank PLC is a public limited company in the United Kingdom with its principal place of business in London, England.  Barclays Bank PLC agreed to fund $100 million under the Revolver facility.

145.    Defendant Deutsche Bank Trust Company Americas is a New York State-chartered bank with its principal office in New York, New York.  Deutsche Bank Trust Company Americas agreed to fund $80 million under the Revolver facility.

741299

1    146.    Defendant The Royal Bank of Scotland PLC is a banking association organized

2    under the laws of the United Kingdom with a branch in New York, New York.  The Royal Bank of

3    Scotland PLC agreed to fund $90 million under the Revolver facility.

4    147.    Defendant Sumitomo Mitsui Banking Corporation is a Japanese corporation with

5    offices in New York, New York.  Sumitomo Mitsui Banking Corporation agreed to fund $90 million

6    under the Revolver facility.

7    148.    Defendant Bank of Scotland is chartered under the laws of Scotland, with its

8    principal place of business in Edinburgh, Scotland.  Bank of Scotland agreed to fund $72.5 million

9    under the Revolver facility.

10    149.    Defendant HSH Nordbank AG is a German banking corporation with a branch in

11    New York, New York.  HSH Nordbank AG agreed to fund $40 million under the Revolver facility.

12    150.    Defendant MB Financial Bank, N.A. is a nationally chartered bank with its main

13    office in Chicago, Illinois.  MB Financial Bank, N.A. agreed to fund $7.5 million under the

14    Revolver facility.

15    151.    Defendant Camulos Master Fund, L.P. is a Delaware corporation with its principal

16    place of business in Stamford, Connecticut.  Camulos Master Fund LP agreed to fund $20 million

17    under the Revolver Facility.

18                                    **THE FONTAINEBLEAU PROJECT**

19    152.    The Project is designed to be a destination casino-resort on the north end of the Las

20    Vegas Strip, situated on approximately 24.4 acres.  The Project consists of a 63-story glass

21    skyscraper featuring over 3,800 guest rooms, suites and condominium units; a 100-foot high three-

22    level podium complex housing casino/gaming areas, restaurants and bars, a spa and salon, a live

23    entertainment theater and rooftop pools; a parking garage with space for more than 6,000 vehicles;

24    and a 353,000 square-foot convention center.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-19-

741299

153.    The Project is also designed to feature retail space (the "Retail Space") of approximately 286,500 square-feet, including retail shops, restaurants, and a nightclub. The Retail Space is being developed by indirect subsidiaries of the Borrowers' parent company ("Fontainebleau Retail") and is funded by separate loans (the "Retail Financing").

154.    The Borrowers broke ground on the Project in January 2007. The Project was originally projected to be complete near year end 2009.

### THE CREDIT AGREEMENT

155.    The Credit Agreement provided for the Term Loan Facility of $700 million, the Delay Draw Facility of $350 million, and the Revolver Facility of $800 million, all having a six-year maturity. Obligations outstanding under the Term Loan Facility, the Delay Draw Facility and the Revolver Facility are equally and ratably collateralized by mortgages on the real property comprising the Project and by security interests on all personal property of the Borrowers. The personal property security interests as well as statutory and/or common law rights of setoff also extend to deposit accounts of the Borrowers, including the Bank Proceeds Account (the "Bank Proceeds Account") established pursuant to the terms of the Disbursement Agreement.

156.    The Credit Agreement and other Loan Documents institute a two-step mechanism for obtaining loans prior to the opening date of the Project. First, the submission by the Borrowers to the Administrative Agent of a notice of borrowing ("Notice of Borrowing") specifying the required loans and designated borrowing date obligates the Lenders to transfer requested funds into the Bank Proceeds Account. Second, the Borrowers must submit an advance request pursuant to the Disbursement Agreement (the "Advance Request"), typically monthly, to secure disbursements from the Bank Proceeds Account that can then be used to pay for the costs of the Project. The Disbursement Agreement also establishes: (a) the conditions to, and the relative sequencing of, disbursements from the proceeds of various facilities and debt instruments, and (b) the obligations of

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

741299

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1    the various agents to make disbursements to the Borrowers of loan proceeds from the Bank Proceeds

2    Account.

### LENDER FUNDING OBLIGATIONS UNDER THE
### DELAY DRAW FACILITY AND THE REVOLVER FACILITY

5        157.    After the Borrowers submit to the Administrative Agent a Notice of Borrowing , the

6    Administrative Agent must promptly notify each lender of the Notice of Borrowing.  Once notified,

7    each lender must make its pro-rata share of the requested loans available to the Administrative

8    Agent prior to 10:00 AM on the designated borrowing date.  The Administrative Agent must then

9    make the funds available no later than 12:00 Noon on the borrowing date by remitting the loan

10    proceeds to the Bank Proceeds Account.

11        158.    Consistent with the staged disbursement process, Section 2.1(c)(iii) of the Credit

12    Agreement provides that the Revolver Facility lenders are not obligated to make loans exceeding

13    $150 million unless the Delay Draw Facility has been fully drawn.  Once the Delay Draw Facility is

14    fully drawn, as was done by the Borrowers' March 2 Notice and the March 3 Notice, the Revolver

15    Facility lenders are irrevocably obligated to fund their loan commitments, subject only to the

16    conditions contained in Section 5.2 of the Credit Agreement.  Section 2.1(c) of the Credit

17    Agreement provides that the "making of Revolving Loans which are Disbursement Agreement

18    Loans to the Bank Proceeds Account shall be subject **only** to the fulfillment of the applicable

19    conditions set forth in Section 5.2. . . ." (emphasis in Credit Agreement)

20        159.    The only relevant conditions to Defendants' contractual obligations to fund under the

21    Revolver Facility contained in Section 5.2 are:

22          (a) Notice of Borrowing. Borrowers shall have submitted a Notice of Borrowing
specifying the amount and Type of the Loans requested, and the making thereof shall
23          be in compliance with the applicable provisions of Section 2 of this Agreement.

24                                    . . .

(c) <u>Drawdown Frequency</u>. Except for Loans made pursuant to Section 3 with respect to Reimbursement Obligations, Loans made pursuant to this Section shall be made no more frequently than once every calendar month unless the Administrative Agent otherwise consents in its sole discretion.

160.    Both of these conditions were met.  The only scenario under which a Revolver Facility lender can refuse to fund under the Revolver Facility is when the Revolver Facility has been terminated in compliance with the specific provisions of Section 8 of the Credit Agreement prior to receipt of a Notice of Borrowing.  Section 8 of the Credit Agreement provides that in the event of an Event of Default, which includes the material falsity of any representation or warranty under the Loan Documents, the Administrative Agent may, with certain required consents of the lenders, by notice to the Borrower declare the loan commitments terminated.  No such action was taken by the Revolver Facility lenders prior to the March 2 Notice or the March 3 Notice.

161.    Section 1.1 of the Credit Agreement defines a "Lender Default" as "the failure or refusal (which has not been retracted in writing) of a Lender to make available (i) its portion of any Loan required to be made by such Lender hereunder . . ."

162.    Section 2.23(g) of the Credit Agreement provides that the obligations to make loans are several and not joint, and the failure of any lender to make any loan does not relieve any other lender of its corresponding obligation to do so, nor is any other lender responsible for the failure of another lender to make its loan.

## DEFENDANTS' BREACHES UNDER THE CREDIT AGREEMENT

163.    Defendants breached the Credit Agreement by refusing to fund their respective shares of the loan commitments under the Revolver Facility, and thereafter purportedly terminating altogether their loan commitments under the Credit Agreement.

741299

**Refusal to Honor the March 2009 Notices of Borrowing**

164.    On March 2, 2009, the Borrowers submitted a Notice of Borrowing for $350 million under the Delay Draw Facility and $670 million under the Revolver Facility (the "March 2 Notice"). Under the Credit Agreement, the Plaintiffs were obligated to fund under the Delay Draw Facility, and the Defendants were obligated to fund under the Revolver Facility by March 3, 2009.

165.    On March 3, 2009, BofA, as the Administrative Agent, sent a letter (the "March 3 Agent Letter") to Borrowers stating that it would not process the March 2 Notice.  The Administrative Agent claimed that the March 2 Notice did not comply with the provisions of Section 2.1(c) of the Credit Agreement, which states that "unless the Total Delay Draw Commitments have been fully drawn, the aggregate outstanding principal amount of all Revolving Loans and Swing Line Loans shall not exceed $150,000,000."  The outstanding principal amount on the Revolver Facility and Swing Line loans on March 3, 2009 was less than $150,000,000.

166.    Also on March 3, 2009 BofA posted on Intralinks a message available to the lenders noting that BofA had determined that the notice of borrowing did not comply with the terms of the Credit Agreement.  While several lenders had already advanced their pro-rata share of the funds, the Administrative Agent on its own accord returned these funds.

167.    As of March 9, 2009, Plaintiffs had not been informed that any Event of Default existed under the Credit Agreement.  However, Plaintiffs are informed and believe that prior to March 3, 2009, BofA had obtained information concerning the Project that caused BofA to determine Events of Default may have existed and that it was in its best interests as a Revolver Facility lender not to comply with the notices of borrowing.  Rather, it was in BofA's interest as a Revolver Facility lender to see that Delay Draw Facility lenders complied with the Notice of Borrowing directed to such lenders, while preventing the funding of the Revolver Facility.  To accomplish this goal, BofA enlisted the support of the other Revolver Facility lenders, including

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

741299

1   Defendants, for its position that the March 2 Notice and the March 3 Notice should not be honored

2   by sharing information with the Defendants concerning the financial condition and status of the

3   Project and the Borrowers, while withholding such information from the Delay Draw Facility

4   lenders.

5       168.    On March 3, 2009, the Borrowers replied to the Administrative Agent by letter

6   ("March 3 Letter") advising that the March 3 Agent Letter was in error and urging the

7   Administrative Agent to reconsider.  The March 3 Letter explained that the Credit Agreement does

8   not prevent the Borrowers from requesting the full amount of the Delay Draw Facility and Revolver

9   Facility pursuant to one Notice of Borrowing.  The Borrowers also submitted an amended Notice of

10  Borrowing ("March 3 Notice") to correct a calculation error specifying that the amount sought was

11  actually $656.52 million.

12      169.    On March 4, 2009, an officer with BofA's Special Assets group with responsibility

13  for the Project wrote to the Borrowers announcing that BofA had formed an ad hoc steering

14  committee (the "Steering Committee") with other unspecified lenders, and that this Steering

15  Committee had decided that the March 2 Notice did not conform to the requirements under the

16  Credit Agreement.

17      170.    On March 6, 2009, the Borrowers sent a letter to the Administrative Agent again

18  noting that the Administrative Agent had improperly failed and refused to process the Notice of

19  Borrowing based on a contrived construction of Section 2.1 of the Credit Agreement.  The letter also

20  noted that other lender parties to the Credit Agreement had informed the Borrowers that they

21  disagreed with the Administrative Agent's interpretation.

22      171.    In light of Defendants' trumped up refusal to fund due to the simultaneous draw

23  notices, and without withdrawing or waiving any rights under the first notice of borrowing, on

24  March 9, 2009 the Borrowers submitted another notice of borrowing requesting only the

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-24-

1   $350 million remaining under the Delay Draw Facility ("March 9 Notice"). The Borrowers

2   expressly reserved their right to contest the Administrative Agent's decision to deny, and the

3   Revolver Facility lenders' refusal to provide, funding under the Revolver Facility in response to the

4   March 2 Notice and the March 3 Notice. The Borrowers explained that the March 9 Notice was

5   being submitted only because of the ongoing need to pay for the costs of the Project.

6       172.   On or about March 10, 2009 and thereafter, pursuant to the March 9 Notice,

7   $336 million of the Delay Draw Facility was funded. A portion of these funds were utilized to pay

8   down the outstanding balance of the Revolver Facility.

9       173.   None of the Defendants have funded their outstanding commitments under the

10  Revolver Facility.

11      174.   The Defendants' failure and refusal to fund the Revolver Facility in response to the

12  March 2 Notice and March 3 Notice is a Lender Default under the express terms of the Credit

13  Agreement.

14      **Improper Approval of the March 25, 2009 Advance Request**

15      175.   On March 4, 2009, in the same letter informing the Borrowers that a Steering

16  Committee had been formed, the Administrative Agent stated that it was "increasingly anxious" to

17  meet with the Borrowers to discuss the Project in light of "construction issues," the "current

18  economic crisis," and "other topics of interest." No specific concern was mentioned. The

19  Borrowers responded on March 16, 2009, stating that they would host a meeting, but that neither

20  holding such a meeting nor providing such information was a condition precedent to the lenders'

21  compliance with the March 2 Notice or the March 3 Notice.

22      176.   On March 16, 2009, BofA sent a letter to the Borrowers acknowledging a meeting

23  with the Borrowers was scheduled for March 20, 2009 and confirming receipt of an Advance

24  Request. BofA noted that the requested Advance Date was March 25, 2009 and stated that

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

741299

1  legitimate questions had been raised by the lenders concerning the Project. BofA also suggested that

2  they would require the Advance Request strictly conform with the terms of the Disbursement

3  Agreement.

4      177.    On March 20, 2009, a meeting was held at the Project site, attended by certain

5  Revolver Facility lenders and other lenders. The information exchanged and discussions which

6  occurred during this meeting preceded the Borrowers drafting an Interim Agreement dated as of

7  April 1, 2009, which provided in part that the lenders signing the agreement would not terminate the

8  Revolving Commitments or declare a Default of Event of Default.

9      178.    On March 25, 2009, the Borrowers finalized the documentation in support of their

10  March Advance Request. BofA authorized the release of $133 million from the Bank Proceeds

11  Account, notwithstanding the information that it and other Revolving Facility lenders had in their

12  possession regarding Defaults or Events of Default. As of March 25, 2009, BofA was aware that the

13  Advance Request should be denied because of existing defaults or misrepresentations under the

14  Financing Agreements; at a minimum, BofA was aware the Borrowers were alleging that the

15  Revolver Facility lenders were in default of their obligations under the Credit Agreement and had

16  reserved all of their rights in connection with that default. The Borrowers reiterated that position in

17  an April 21, 2009 letter to BofA. In its various capacities, including but not limited to as

18  Disbursement Agent, Bank Agent, and Administrative Agent, BofA had a duty to act in good faith

19  and to exercise commercially reasonable efforts and commercially prudent practices in approving

20  Advance Requests. Instead of fulfilling these duties, BofA acted in bad faith and favored its own

21  interests over that of the Delay Draw Facility lenders and disregarded evidence in its possession that

22  the March Advance Request should be denied.

23      **Improper Termination of the Revolving Loan Commitments**

24      179.    On April 13, 2009, the Borrowers notified the lenders (the "April 13 Notice")

741299

1  pursuant to the Disbursement Agreement and other Loan Documents, that as of that date it did not

2  believe that the Project satisfied the test that remaining costs and available funds be in balance (the

3  "In Balance Test").  Under the Disbursement Agreement, for the In Balance Test to be met, the

4  remaining costs to complete the Project cannot exceed Borrowers' available resources.  Failure to

5  satisfy the In Balance Test is not an Event of Default, and does not permit the Administrative Agent

6  or the Revolver Facility lenders to refuse to comply with a Notice of Borrowing.

7       180.    On April 17, 2009, the Borrowers and certain lenders met in New York to discuss the

8  status of the Project.  On April 20, 2009, the Steering Committee's counsel sent a letter to the

9  Borrowers' counsel on behalf of "a number of Steering Committee institutions," including lenders

10  under the Revolver Facility.  The letter requested additional information, including an assessment of

11  the March In Balance Test.

12       181.    Also on April 20, 2009, only hours after the request for additional information had

13  been sent, and prior to any response by Borrowers, the Administrative Agent sent the Borrowers a

14  letter (the "Termination Letter") stating that the lenders under the Revolver Facility had determined

15  that "one or more Events of Default have occurred and are continuing" and that the Revolver

16  Facility commitments were terminated effective immediately.  The Termination Letter did not

17  specify the nature of the purported Events of Default.

18       182.    On April 21, 2009, the Borrowers' counsel wrote a letter to the Administrative

19  Agent's counsel advising that there had been no Event of Default, that the Termination Letter was

20  ineffective, and that unless it was withdrawn immediately the Borrowers would pursue all available

21  remedies.

22       **Failure to Honor the April 21, 2009 Notice of Borrowing**

23       183.    On April 21, 2009, the Borrowers submitted a Notice of Borrowing (the "April 21

24  Notice") to the Administrative Agent, drawing down $710 million under the Revolver Facility.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

741299

Under the Credit Agreement, this amount was required to be funded by 12:00 noon on April 23, 2009. It was not, and thus Defendants once again breached their obligations under the Credit Agreement.

### FIRST CLAIM FOR RELIEF
### Breach of the Credit Agreement Against All Defendants

184.    Plaintiffs reallege and incorporate each and every allegation contained in paragraphs 1 through 183 hereof.

185.    The Credit Agreement is a valid and binding contract, pursuant to which the Defendants agreed to fund $790 million under the Revolver Facility.

186.    The March 2 Notice, the March 3 Notice, and the April 21 Notice (collectively, "Notices of Borrowing") complied with all applicable conditions under the Credit Agreement. Plaintiffs have performed all obligations required of them under the Credit Agreement.

187.    Pursuant to the terms of the Credit Agreement, the Defendants were, and continue to be, obligated to honor the Notices of Borrowing.

188.    The Defendants' failure to honor the Notices of Borrowing constitutes a material breach of their obligations under the Credit Agreement.

189.    In the Termination Letter, the Administrative Agent states that it and all Defendants have determined that one or more Events of Default have occurred, although they failed to identify any such Event of Default.

190.    By repudiating their obligations to fund under the Revolver Facility, the Defendants have breached the Credit Agreement.

191.    Plaintiffs have suffered injury as a result of the breach because, as a result of the Defendants' refusal to honor their obligation to fund the Revolver Facility, the amount and value of Plaintiffs' collateral has been and continues to be diminished.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-28-

741299

## SECOND CLAIM FOR RELIEF
### Breach of the Disbursement Agreement Against BofA

192.    Plaintiffs reallege and incorporate each and every allegation contained in paragraphs 1 through 191 hereof.

193.    The Disbursement Agreement is a valid and binding contract, pursuant to which BofA agreed to act as Bank Agent (which is defined in the Disbursement Agreement as the Administrative Agent under the Credit Agreement), and/or Disbursement Agent.  The Disbursement Agreement was intended to directly benefit Plaintiffs.

194.    The March 25, 2009 Advance Request, and perhaps prior Advance Requests, should have been denied due to one or more Defaults, Events of Default, or misrepresentations made as of the Advance Date.

195.    Pursuant to the terms of the Disbursement Agreement, BofA had a duty to exercise commercially reasonable efforts and use commercially prudent practices in approving Advance Requests.  As opposed to fulfilling these duties, BofA acted in bad faith and favored its own interests over that of the Delay Draw lenders.

196.    BofA's failure to fulfill its obligations as Bank Agent (Administrative Agent) and/or Disbursement Agent by approving the March 25, 2009 Advance constitutes a material breach of its obligations under the Disbursement Agreement.

197.    Plaintiffs have suffered injury as a result of the breach because, as a result of BofA's approval of the Advance Request, the amount and value of Plaintiffs' collateral has been and continues to be diminished.

-29-

741299

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

### THIRD CLAIM FOR RELIEF
### Breach of the Implied Covenant of Good Faith and Fair Dealing
### Against All Defendants

198.    Plaintiffs reallege and incorporate each and every allegation contained in paragraphs 1 through 197 hereof.

199.    The Credit Agreement is a valid and binding contract, pursuant to which the Defendants agreed to fund $790 million under the Revolver facility.

200.    The Credit Agreement contained an implied covenant of good faith and fair dealing. The covenant is intended to prevent parties to a contract from destroying or injuring the right of another party to enjoy the fruits of the contract.

201.    Defendants owed Plaintiffs a duty of good faith and fair dealing as parties to the same Credit Agreement.

202.    The Administrative Agent and the other Defendants breached the covenant by adopting a contrived construction of the Credit Agreement in an attempt to justify their refusal to fund the Revolver Facility.  Furthermore, Defendants breached the covenant by terminating the Revolver Facility on the ground that an Event of Default had occurred when in fact no such Event of Default had been declared.

203.    Plaintiffs have performed all obligations required of them under the Credit Agreement.

204.    Plaintiffs have suffered injury as a result of the breach of the covenant because, as a result of the Defendants' refusal to honor their obligation to fund under the Revolver Facility, the amount and value of Plaintiffs' collateral has been and continues to be diminished.  Furthermore, Plaintiffs have been prevented from receiving the benefits of their bargain under the contract because their ability to obtain repayment on their loans has been endangered.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

741299

1

## FOURTH CLAIM FOR RELIEF
### For Breach of the Implied Covenant of Good Faith Against BofA

2

3

205.    Plaintiffs reallege and incorporate each allegation contained in paragraphs 1 through

4

204 hereof.

5

206.    As agent for Plaintiffs, BofA assumed duties to Plaintiffs to communicate all material

6

facts fully and completely at the time of any required communication, and not to prefer one set of

7

lenders over another in its communications and actions.

8

207.    Defendant BofA breached its duties by virtue of the acts and advice described above.

9

208.    None of the Plaintiffs were aware of the material, omitted facts that BofA failed to

10

communicate, and reasonably relied on the BofA silence to indicate that such facts did not exist.

11

209.    In reasonable reliance on the assumption that they were in possession of all material

12

facts, and being unaware of facts known to BofA and not known by Plaintiffs, the Plaintiffs funded

13

their share of requested loan proceeds at a time when it was unlikely that those advances would ever

14

be repaid.  Had they known the truth, Plaintiffs could have terminated their obligations to fund the

15

Delay Draw Facility prior to the March 9 Notice.

16

210.    As a result of BofA's failure to properly disclose truthful information concerning the

17

Borrowers and/or the Project, Plaintiffs have been injured in an amount to be established at trial.

18

## FIFTH CLAIM FOR RELIEF
### For Declaratory Relief Against All Defendants

19

211.    Plaintiffs reallege and incorporate each and every allegation contained in paragraphs

20

1 through 210 hereof.

21

212.    A dispute has arisen between Plaintiffs and Defendants regarding their respective

22

rights and obligations under the Credit Agreement.  Plaintiffs contend that Defendants have

23

breached this agreement by failing to fund and by terminating their loan commitments under the

24

Revolver Facility.  Plaintiffs are informed and believe and thereon allege that Defendants contend

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-31-

1  that they have acted in good faith and in compliance of their obligations under the Credit

2  Agreement.

3      213.    A judicial determination is therefore necessary to resolve this dispute and ascertain

4  the respective rights of the parties with regard to the actions and agreements referenced in this

5  complaint.

## SIXTH CLAIM FOR RELIEF
### For Declaratory Relief Against BofA

6

7      214.    Plaintiffs reallege and incorporate each and every allegation contained in paragraphs

8

9  1 through 213 hereof.

10     215.    A dispute has arisen between Plaintiffs and BofA regarding BofA's obligations to

11  Plaintiffs as intended third party beneficiaries under the Disbursement Agreement. Plaintiffs contend

12  that BofA has breached this agreement by approving the March 25, 2009 Advance Request.

13  Plaintiffs are informed and believe and thereon allege that BofA contends that it has acted in good

14  faith and in compliance with its obligations under the Disbursement Agreement.

15     216.    A judicial determination is therefore necessary to resolve this dispute and ascertain

16  the respective rights of the parties with regard to the actions and agreements referenced in this

17  complaint.

## PRAYER FOR RELIEF

18

19  **WHEREFORE**, Plaintiffs pray for judgment against the Defendants, and each of them,

20      (a)    For compensatory damages in an amount subject to proof at trial.

21      (b)    For a declaration that Defendants have breached their contractual duties under the

22  Credit Agreement as set forth above entitling Plaintiffs to damages in an amount subject to proof at

23  trial.

24      (c)    For a declaration that BofA has breached its contractual duties under the

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-32-

741299

1  Disbursement Agreement as set forth above entitling Plaintiffs to damages in an amount subject to

2  proof at trial.

3        (d)    For a declaration that Plaintiffs are excused from performance of any obligations

4  owing to Defendants under the Credit Agreement.

5        (e)    An award of the costs of suit including attorneys' fees.

6        (f)    Any further relief as this Court deems just and proper.

7                                **JURY DEMAND**

8        Plaintiffs demand a trial by jury for all issues so triable.

9

10  DATED:  June 9, 2009                    HENNIGAN, BENNETT & DORMAN LLP

11

12

13                                         By: /s/J. Michael Hennigan
                                               J. Michael Hennigan *(will comply with LR 1A*
14                                             *10-2 within 45 days)*
                                               Attorneys for Plaintiffs
15

16

17

18

19

20

21

22

23

24

741299